
    
         1 2024 CO 55 Reginald Keith Clark, Petitioner  v.  The People of the State of Colorado. Respondent No. 22SC313Supreme Court of Colorado, En BancJuly 1, 2024
  Certiorari to the Colorado Court of Appeals Court of Appeals Case No. 19CA340 
  Attorneys for Petitioner: Megan A. Ring, Public Defender Casey Mark Klekas, Deputy Public Defender 
  Attorneys for Respondent: Philip J. Weiser, Attorney General Patrick A. Withers, Senior Assistant Attorney General 
  Attorneys for Amici Curiae Colorado Hispanic Bar Association, Asian Pacific American Bar Association, South Asian Bar Association of Colorado, and Sam Cary Bar Association: Lewis Roca Rothgerber Christie LLP Kendra N. Beckwith Tyler J. Owen 
 2
  Attorneys for Amici Curiae Colorado-Montana-Wyoming Area Conference of the National Association for the Advancement of Colored People and American Civil Liberties Union of Colorado: Martina Tiku Anna Kathryn Barnes 
  Timothy R. Macdonald Anna I. Kurtz 
  Attorneys for Amicus Curiae Mountain States Legal Foundation: William E. Trachman James L. Kerwin 
  Attorneys for Amici Curiae Office of the Alternate Defense Counsel and Colorado Criminal Defense Bar: Law Offices of Ann M. Roan, LLC Ann M. Roan 
  JUSTICE MÁRQUEZ delivered the Opinion of the Court, in which CHIEF JUSTICE BOATRIGHT, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER joined. JUSTICE HOOD, joined by JUSTICE GABRIEL, dissented. 
 3
  OPINION 
  MÁRQUEZ, JUSTICE 
  ¶1 Racial discrimination, while detestable in any context, is "especially pernicious" in the criminal justice system. Rose v. Mitchell, 443 U.S. 545, 555 (1979). "[S]uch discrimination 'not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.'" Id. at 556 (quoting Smith v. Texas, 311 U.S. 128, 130 (1940)). Criminal defendants have the right to an impartial jury, U.S. Const. amend. VI; Colo. Const. art. II, § 16, which includes the right to be tried by jurors who can consider the case without the influence of racial animus, Georgia v. McCollum, 505 U.S. 42, 58 (1992). The jury, after all, is meant to be "a criminal defendant's fundamental 'protection of life and liberty against rac[ial] . . . prejudice.'" Pena-Rodriguez v. Colorado, 580 U.S. 206, 223 (2017) (quoting McCleskey v. Kemp, 481 U.S. 279, 310 (1987)). 
  ¶2 Procedures for preventing biased jurors from serving are critical to the protection of the defendant's right to an impartial jury. McCollum, 505 U.S. at 58. In Colorado, judges must dismiss for cause jurors who "evinc[e] enmity or bias toward the defendant or the state." § 16-10-103(1)(j), C.R.S. (2023). Where a trial court's erroneous denial of a challenge for cause results in seating a juror who is biased against the defendant, the defendant's Sixth Amendment right to an 
 4
  impartial jury is violated, and the conviction must be reversed. People v. Abu-Nantambu-El, 2019 CO 106, ¶ 29, 454 P.3d 1044, 1050. 
  ¶3 If, however, a juror evinces racial bias during voir dire but does not ultimately serve on the jury, no Sixth Amendment violation has occurred. These are the circumstances we are presented with today. 
  ¶4 Reginald Keith Clark, a Black man, was charged with multiple crimes arising from his alleged sexual assault of A.B., a white woman. He faced trial in Gilpin County, an area that is predominantly white.[1] During voir dire, a venire member made comments that Clark believed evinced racial bias. Clark moved to strike the juror for cause, but the trial court denied the challenge, concluding that the juror's statements expressed a political view and did not indicate that he could not be fair. Clark later removed the juror using a peremptory challenge. Thus, the juror did not sit on the jury. Clark was convicted and appealed on multiple grounds. 
  ¶5 In a divided opinion, the court of appeals affirmed Clark's conviction. People v. Clark, 2022 COA 33, ¶ 1, 512 P.3d 1074, 1076. In its discussion of the trial 
 5
  court's ruling on the challenge for cause, the division's lead opinion focused its analysis on the Sixth Amendment. Id. at ¶¶ 22-32, 512 P.3d at 1079-80. Judge Schutz's partial dissent included a discussion of the Equal Protection Clause, particularly within the context of Batson v Kentucky, 476 U.S. 79 (1986), and its progeny Clark, ¶¶ 89-102, 512 P.3d at 1089-92 (Schutz, J, concurring in part and dissenting in part). We granted Clark's petition for certiorari review of two issues.[2] 
  ¶6 First, we consider whether the trial court's denial of Clark's for-cause challenge may be analyzed for harmlessness or instead constitutes structural error requiring reversal. In light of Supreme Court and Colorado precedent, we conclude that, because any error by the trial court was made in good faith and because the juror never actually sat on the jury, Clark's Sixth Amendment right to an impartial jury was not violated. Accordingly, the trial court's erroneous denial of the challenge for cause in this case did not result in structural error and automatic reversal is not required. And because no state actor purposefully 
 6
  discriminated against Clark (or anyone else) on the basis of race, no equal protection violation occurred either. 
  ¶7 Second, we separately conclude that a juror's comment about her previous jury experience recalling a judge's alleged statement that the jury must deliberate until it reached a unanimous verdict does not constitute "extraneous prejudicial information" under CRE 606(b). 
  ¶8 Accordingly, we affirm the judgment of the court of appeals and uphold Clark's conviction. 
  I. Facts and Procedural History 
  ¶9 In November 2017, Clark approached A.B. in his car as she was walking through downtown Denver to catch a bus. Clark offered A.B. a ride. A.B., who recognized Clark, accepted. A.B. asked Clark to take her to a nearby location, but Clark instead drove into the mountains near Black Hawk. 
  ¶10 During the drive, Clark stopped and sexually assaulted A.B. Shortly after this, A.B. ran away. Police officers later contacted her on the side of the road. A.B. told them about the assault and described her assailant. Soon after, the officers spotted Clark driving in the vicinity and arrested him. 
  ¶11 Clark was charged in Gilpin County with second degree kidnapping, § 18-3-302(1), (3), C.R.S. (2023); sexual assault with a deadly weapon, § 18-3-402(1)(a), (5)(a)(III), C.R.S. (2023); sexual assault caused by threat of 
 7
  imminent harm, § 18-3-402(1)(a), (4)(b); and sexual assault achieved through the application of physical force, § 18-3-402(1)(a), (4)(a). The case proceeded to a jury trial. 
  A. Voir Dire 
  ¶12 During voir dire, defense counsel raised the issue of race, noting that Clark was the only Black individual in the courtroom. One potential juror commented that if she were in Clark's position, she might doubt the fairness of the trial and "would like to see a little more diversity" in the courtroom. Other potential jurors agreed that some people in Gilpin County might have stereotypes about Black men. Soon after, the conversation moved away from the topic of diversity. A few minutes later, defense counsel asked Juror K about his thoughts related to the presumption of innocence, inquiring whether he thought the prosecution "start[ed] off . . . with a little bit of a lead," given that Clark was charged with a crime. Juror K responded by returning to the topic of diversity, saying: 
 
 You've said a lot, and I'm trying to think through
 each thing.... I apologize for some of my thoughts.... The
 diversity and stuff, yes, it's obvious there's a
 [B]lack gentleman over there. This is Gilpin County. I moved
 to Gilpin County. I didn't want diversity. I want to be
 diverse up on top of a hill. That's—I hear the
 things, that diversity makes us stronger and things like
 that. I don't quite believe it in life from what my
 personal experiences are. And I can't change that. I can
 look and judge what is being said by your side and their side
 and be fair, but I can't change that—when I walked
 in here seeing a [B]lack gentleman here. And I can't say
 that the prosecutor has a leg up on this or something until I
 hear what's happened.
 
 8
  ¶13 At a bench conference, Clark challenged Juror K for cause. As Clark later explained,[3] his basis for the challenge was that Juror K's statements about diversity were unprompted and reflected "actual bias and prejudice." Following this challenge, the court asked Juror K additional questions: 
 
 Court: So here's kind of the two-part bottom line .... If
 you're chosen as a juror in this case, and if you're
 back in the jury room and you think the prosecution
 hasn't proven its case, would you have any trouble
 finding this defendant to be not guilty?
 
 
 Juror K: Not at all.
 
 
 Court: And the other side of that coin, what if you're
 back there and you say that [the] prosecutor has proven his
 case, would you have any trouble finding the defendant to be
 guilty?
 
 
 Juror K: Again, the same answer. Not at all.
 
  ¶14 The court denied the challenge, and later provided its reasoning that Juror K's statements "that he didn't think that diversity was a good thing" expressed "a political view" and did not "answer the question of whether he can be a fair juror." The judge observed that "a person can certainly have offensive views and still apply the law. Those two things are really separate in my mind." 
 9
  ¶15 After his challenge for cause was denied, Clark exercised all of his allotted peremptory strikes, using his first to remove Juror K. Juror K was excused and did not sit on the jury. 
  B. Statements Made During Jury Deliberations 
  ¶16 After deliberating for approximately seventeen hours over three days, the jury convicted Clark of second degree kidnapping and sexual assault caused by threat of imminent harm. The court sentenced Clark to eighteen years for the kidnapping conviction and a consecutive term of twelve years to life for the sexual assault. 
  ¶17 Following the verdict, Clark filed a motion for a new trial based on an affidavit from Juror LL. The affidavit explained that the jury was deadlocked for the first two days of deliberations. Juror LL alleged that on the third day of deliberations, another juror 
 
 mentioned a previous jury they [sic] she served on, in which
 the jury was told by the judge "I don't want a hung
 jury, and I want you guys to stay as long as you need to
 become unanimous." That juror stated that she was told
 in the previous trial by the judge that the jury must
 deliberate until a unanimous verdict was reached.... The
 original juror who referenced her previous jury service,
 presented that information as the factual information about
 the law that the jury was required to reach a unanimous
 verdict.
 
  ¶18 Juror LL further alleged that the other juror's statement sparked fears among the other jurors about the impact that protracted deliberations would have 
 10
  on their personal and professional lives, and, as a result, many jurors—including her—voted guilty to avoid those ramifications. 
  ¶19 Based on this information, Clark requested a new trial or, alternatively, an evidentiary hearing. As relevant here, Clark argued that Juror LL's affidavit was admissible under the extraneous prejudicial information exception to CRE 606(b). The court disagreed, concluding that the affidavit did not allege the introduction of "extraneous prejudicial information" for purposes of meeting the exception to CRE 606(b), which otherwise prohibits a juror from testifying as to any statements made during jury deliberations. Consequently, the court concluded it could not consider the statements in the juror's affidavit. It therefore denied Clark's motion. 
  C. The Court of Appeals' Decision 
  ¶20 Clark appealed his conviction, and in a divided opinion, the court of appeals affirmed. Clark, ¶ 1, 512 P.3d at 1076. 
  ¶21 With respect to the challenge for cause, the division split three ways. Judges Fox and Schutz agreed with Clark that the trial court erred when it denied Clark's challenge for cause of Juror K. Id. at ¶ 21, 512 P.3d at 1079; id. at ¶ 78, 512 P.3d at 1086-87 (Schutz, J., concurring in part and dissenting in part). Judge Dailey would have given more deference to the trial court's ruling and thus disagreed that the trial court erred in this case. Id. at ¶ 62, 512 P.3d at 1084 (Dailey, J., concurring in the judgment). 
 11
  ¶22 Regarding the remedy, the lead opinion, authored by Judge Fox, concluded that, under this court's decision in People v. Novotny, 2014 CO 18, 320 P.3d 1194, the trial court's erroneous denial of Clark's for-cause challenge did not amount to structural error. Clark, ¶ 26, 512 P.3d at 1079. Judge Fox disagreed with Clark's argument that the trial court's error fell within Novotny's exception for errors made in "other than good faith." Id. at ¶¶ 27-28, 512 P.3d at 1080. Judge Fox also rejected Clark's argument that the trial court's error forced him to use a peremptory challenge to remove Juror K and thus deprived him of equal protection of the law. Id. at ¶¶ 29-32, 512 P.3d at 1080. Judge Fox reasoned that this argument was foreclosed by this court's decision in Vigil v. People, 2019 CO 105, 455 P.3d 332. Clark, ¶ 31, 512 P.3d at 1080. Accordingly, Judge Fox concluded that the trial court's error should be analyzed for harmlessness and, because Juror K did not actually participate in the jury, the error was necessarily harmless. Id. at ¶ 32, 512 P.3d at 1080. Judge Dailey concurred in the judgment. He agreed that under Novotny, any error by the trial court in denying the for-cause challenge did not warrant a new trial. Id. at ¶ 61, 512 P.3d at 1084 (Dailey, J., concurring in the judgment). 
  ¶23 In a partial dissent, Judge Schutz agreed with Clark that the error was structural and required automatic reversal. Id. at ¶ 79, 512 P.3d at 1087 (Schutz, J., concurring in part and dissenting in part). In his view, this case presented an 
 12
  exception to Novotny's outcome-determinative analysis. Id. at ¶¶ 85-86, 512 P.3d at 1088. 
  ¶24 According to Judge Schutz, the trial court's "tolerance" of Juror K's express racial bias amounted to structural error, not because it violated Clark's right to an impartial jury, but because it violated his right to equal protection. Id. at ¶ 95, 512 P.3d at 1090. In reaching this conclusion, Judge Schutz drew comparisons to the Supreme Court's opinion in Batson, a case addressing racial bias in the jury selection process through the discriminatory use of peremptory challenges: 
 
 While the structural error created by Batson
 typically arises through the exercise of a peremptory
 challenge, the equal protection violation is even more
 pronounced in the context of a trial court's failure to
 grant a challenge for cause against a juror who has confirmed
 his racial bias against a defendant. In such situations,
 racial bias in the jury selection process need not be
 assumed, it has been openly acknowledged to the court, the
 parties, and the public. If the injection of assumed bias
 into the jury selection process through the exercise of a
 peremptory challenge creates structural error, then surely
 the trial court's tolerance of a prospective juror's
 express racial bias after that bias has been brought to the
 court's attention through a challenge for cause also
 constitutes structural error.
 
  Id. at ¶ 95, 512 P.3d at 1090. 
  ¶25 Judge Schutz further reasoned that Batson was designed to serve multiple ends, including circumstances like this where, as he saw it, the trial court's error sent a message that racial bias may be tolerated in the criminal justice system. Id. at ¶¶ 96, 98, 512 P.3d at 1090-91. Whereas Judge Fox's opinion evaluated the challenge-for-cause error through a Sixth Amendment lens, Judge Schutz viewed 
 13
  the issue as implicating a defendant's Fourteenth Amendment right to equal protection because the juror's bias against the defendant was based on race. Id. at ¶¶ 100-02, 512 P.3d at 1091-92. In other words, Judge Schutz equated Batson's reference to "racial bias in the jury selection process" with a potential juror's expression of racial bias against the defendant during voir dire. See id. at ¶¶ 95-102, 512 P.3d at 1090-92. 
  ¶26 As for Juror LL's affidavit, the majority decided that the trial court correctly determined that the statements it contained did not constitute extraneous prejudicial information and therefore did not meet the exception to CRE 606(b).[4]Id. at ¶ 59, 512 P.3d at 1084 (majority opinion). Relying on People v. Newman, 2020 COA 108, 471 P.3d 1243, the division majority concluded that "extraneous prejudicial information" consists of (1) legal content and specific factual information (2) learned from outside the record (3) that is relevant to the issues in a case. Clark, ¶ 52, 512 P.3d at 1083. The majority declined to construe the phrase "relevant to the issues in a case" so broadly as to include a general statement about how juries handle protracted deliberations. Id. at ¶ 58, 512 P.3d at 1084. Such a 
 14
  broad construction, the majority reasoned, would be inconsistent with the purposes of CRE 606(b) and Colorado precedent. Id. 
  ¶27 We granted Clark's petition for certiorari review on these two issues and now address them in turn. 
  II. Analysis 
  ¶28 We first address Clark's argument that the trial court's denial of his for-cause challenge to Juror K amounted to structural error and required automatic reversal. Applying our precedent, we conclude that any error by the trial court was made in good faith, and because Juror K did not actually serve on the jury, the court's error was harmless. 
  ¶29 We then turn to the second issue before us—whether the statements in Juror LL's affidavit constitute "extraneous prejudicial information" for purposes of CRE 606(b). We conclude that the juror's comment recounting a judge's statement about jury deliberations during a past jury experience was not legal content relevant to Clark's case. Accordingly, we hold that the information was not extraneous prejudicial information for purposes of the exception to Rule 606(b). 
 15
  A. The Erroneous Denial of a For-Cause Challenge to a Biased Juror Is Harmless When It Is Cured Through the Use of a Peremptory Strike 
  ¶30 The division determined that the trial court's denial of Clark's for-cause challenge to Juror K was an abuse of discretion. Clark, ¶ 21, 512 P.3d at 1079. The People do not challenge this ruling. We therefore assume for the purpose of our analysis that the trial court erred when it denied the challenge for cause to Juror K. The question is whether this error is structural and requires automatic reversal or instead is subject to harmless-error analysis. 
  ¶31 Clark's primary argument, mirroring Judge Schutz's partial dissent, is that our decisions in Novotny and Vigil do not apply because the trial court's erroneous denial of his for-cause challenge to Juror K implicated his rights to equal protection under the Fourteenth Amendment. Alternatively, Clark argues that the trial court's error falls outside the general rule in Novotny and Vigil. 
  ¶32 We begin with a discussion of the applicable standard of review. Next, we review the distinction between structural error requiring automatic reversal and trial error that is analyzed for harmlessness. We then describe Supreme Court and Colorado precedent, including Novotny and Vigil, regarding the standard of reversal that applies to errors impacting the use of peremptory challenges. Consistent with that precedent, we conclude that the trial court's error is subject to harmless-error analysis. We also reject Clark's argument that the error 
 16
  amounted to a violation of his equal protection rights. Accordingly, applying the harmless-error standard of reversal, we determine that any error by the trial court was harmless and does not warrant reversal. 
  1. Standard of Review 
  ¶33 The determination of the proper standard of reversal to be applied in a case is a question of law that we review de novo. See A.R. v. D.R., 2020 CO 10, ¶ 37, 456 P.3d 1266, 1276 (identifying de novo review as the proper standard of review for the determination of the proper legal standard to apply); Abu-Nantambu-El, ¶ 23, 454 P.3d at 1050 (reviewing de novo which standard of reversal applies when a trial court erroneously denies a challenge for cause and the juror ultimately serves on the jury). 
  2. Structural Errors and the Sixth Amendment 
  ¶34 "Certain constitutional rights are so basic to a fair trial that their violation can never be harmless." Abu-Nantambu-El, ¶ 27, 454 P.3d at 1050 (citing Gray v. Mississippi, 481 U.S. 648, 668 (1987)). Such errors have been deemed "structural errors" because they are not "'simply an error in the trial process itself,'" but rather "affect the 'framework within which the trial proceeds'"—that is, the very structure of the trial itself. People v. Fry, 92 P.3d 970, 980 (Colo. 2004) (quoting Blecha v. People, 962 P.2d 931, 942 (Colo. 1998)). Whereas ordinary errors in the trial process 
 17
  may be deemed harmless, structural errors are incompatible with harmless error analysis. Id. 
  ¶35 We have held that when a trial court's error results in the seating of a juror who is biased against the defendant, the error is structural. Abu-Nantambu-El, ¶ 30, 454 P.3d at 1050 (first citing United States v. Martinez-Salazar, 528 U.S. 304, 316 (2000); then citing Ross v. Oklahoma, 487 U.S. 81, 85 (1988); and then citing Morrison v. People, 19 P.3d 668, 670 (Colo. 2000)). Such an error violates the defendant's right to "[a] fair and impartial jury[, which] is a key element of a defendant's constitutional right to a fair trial under both the United States and Colorado Constitutions." Id. at ¶ 14, 454 P.3d at 1047 (first citing U.S. Const. amends. V, VI, XIV; then citing Colo. Const. art. II, §§ 16, 25; then citing Vigil, ¶ 9, 455 P.3d at 334; and then citing People v. Russo, 713 P.2d 356, 360 (Colo. 1986)). 
  ¶36 Both for-cause and peremptory challenges serve as means of securing this right. First, Colorado law requires a court, upon a party's challenge, to remove a juror for cause when particular circumstances implicate the juror's ability to remain impartial. Id. at ¶ 15, 454 P.3d at 1048. Relevant here, section 16-10-103(1)(j) requires a trial court to excuse a juror who "evinc[es] enmity or bias toward the defendant or the state." Second, section 16-10-104, C.R.S. (2023), permits both parties to exercise peremptory challenges, which allow the removal of "jurors whom they perceive as biased." Abu-Nantambu-El, ¶ 18, 454 P.3d at 1048 
 18
  (quoting Vigil, ¶ 19, 455 P.3d at 337). The number of peremptory challenges available depends on the circumstances of the case and the nature of the charge. 
  ¶37 Prior to Novotny and Vigil, Colorado precedent required automatic reversal when a defendant used a peremptory strike to remove a prospective juror who should have been removed for cause and the defendant otherwise exhausted their peremptory challenges. People v. Macrander, 828 P.2d 234, 243 (Colo. 1992), overruled by Novotny, ¶ 27, 320 P.3d at 1203. We changed course in Novotny and Vigil in recognition of jurisprudential developments in the understanding of trial error and structural error that followed our decision in Macrander. See Novotny, ¶ 27, 320 P.3d at 1203 (concluding "that allowing a defendant fewer peremptory challenges than authorized, or than available to and exercised by the prosecution, does not, in and of itself, amount to structural error" and overruling prior holdings to the contrary); Vigil, ¶ 22, 455 P.3d at 338 ("For virtually the same reasons we found it important and justified in Novotny to partially overturn this line of our own prior holdings, we consider it similarly justified to now overturn them in full. To the extent that our prior rationale was based on pre-harmless error holdings, the constitutional significance of peremptory challenges, and even federal due process implications of violating state peremptory challenge law, those premises have now all been independently swept away by developments in the 
 19
  jurisprudence of the Supreme Court which we have either already adopted or by which we are constitutionally bound."). 
  ¶38 Novotny also relied on Supreme Court case law recognizing that peremptory strikes are rooted in state law, not the federal constitution. ¶¶ 14-17, 320 P.3d at 1199-1200 (citing, inter alia, Rivera v. Illinois, 556 U.S. 148, 157 (2009)) (explaining that "the United States Supreme Court has now expressly rejected the understanding we, and a substantial number of other jurisdictions, had of the federal due process implications of" a state court depriving a defendant of a statelaw granted peremptory challenge); see also Martinez-Salazar, 528 U.S. at 311 ("[U]nlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension."). Our decision in Vigil likewise emphasized that "neither the prosecution nor the defendant is granted any right in this jurisdiction, by constitution, statute, or rule, to shape the composition of the jury through the use of peremptory challenges," thus a "defendant could not [be] harmed by the deprivation of any such right." Vigil, ¶ 25, 455 P.3d at 339. 
  ¶39 Accordingly, Vigil rejected the notion that a defendant who uses a peremptory strike to remove a juror for whom the trial court erroneously denied a for-cause challenge was effectively "forced" to use their peremptory strike. ¶ 21, 455 P.3d at 337-38 (citing Martinez-Salazar, 528 U.S. at 314-15); 
 20
  see also Ross, 487 U.S. at 90-91 ("As required by [state] law, petitioner exercised one of his peremptory challenges to rectify the trial court's error, and consequently he retained only eight peremptory challenges to use in his unfettered discretion. But he received all that [state] law allowed him, and therefore his due process challenge fails."). 
  ¶40 Our decision in Novotny acknowledged that, aside from "an actual Sixth Amendment violation," there may be some circumstances in which an erroneous denial of a for-cause challenge does rise to the level of structural error, requiring automatic reversal. ¶¶ 23, 27, 320 P.3d at 1202-03. Citing Martinez-Salazar, the court acknowledged that such reversible errors include violations of state law "committed in other than good faith." Id. at ¶ 23, 320 P.3d at 1202 (citing Martinez-Salazar, 528 U.S. at 316-17). In Martinez-Salazar, the Supreme Court held "that a defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." Martinez-Salazar, 528 U.S. at 317. But in so doing, the Court noted that the case before it did not involve any assertion that the trial court "deliberately misapplied the law in order to force the defendants to use a peremptory challenge to correct the court's error." Id. at 316 (citation omitted) (citing Ross, 487 U.S. at 91 n.5). 
 21
  ¶41 Novotny thus contemplated two ways an erroneous denial of a for-cause challenge might rise to the level of structural error: (1) where the error resulted in a Sixth Amendment violation because the biased juror actually served on the jury, and (2) where the error involved a deliberate misapplication of the law intended to disadvantage the defendant. 
  ¶42 The law in Colorado following Novotny and Vigil is clear: when a defendant uses a peremptory challenge to correct a trial court's erroneous denial of a challenge for cause, "so long as the defendant receives both an impartial jury and the number of peremptory challenges specified by state statute, the defendant's constitutional rights remain unaffected." Abu-Nantambu-El, ¶ 20, 454 P.3d at 1049; see also Novotny, ¶¶ 23, 27, 320 P.3d at 1202-03. Absent bad faith, any such error that does not result in the biased juror actually participating on the jury is necessarily harmless. Abu-Nantambu-El, ¶ 20, 454 P.3d at 1049. 
  ¶43 Here, Clark was permitted to use his statutorily allotted number of peremptory challenges. Juror K did not serve on the jury for Clark's trial, and Clark does not allege that any biased juror otherwise evaded removal. Under Novotny and Vigil, any error by the trial court in denying the challenge for cause to Juror K was harmless. 
  ¶44 Clark nevertheless argues that the trial court's error deprived him of a peremptory challenge because he was forced to use one to cure the trial court's 
 22
  error. But as Judge Fox noted below, this argument is foreclosed by our reasoning in Vigil and the Supreme Court's decision in Martinez-Salazar, which expressly rejected this argument. Clark, ¶ 31, 512 P.3d at 1080; Vigil, ¶ 21, 455 P.3d at 337; Martinez-Salazar, 528 U.S. at 314-15. Clark's choice to exercise a peremptory challenge against Juror K was an exercise of the full guarantee of what he was granted by statute. 
  ¶45 Clark also argues that the trial court's error was not made in good faith and thus Novotny and Vigil's general rule for peremptory challenges does not apply. But nothing in the record indicates that the court deliberately misapplied the law in order to force Clark to sacrifice a peremptory challenge, and Clark alleges no facts that indicate the trial court otherwise acted in bad faith. 
  ¶46 In sum, any error by the trial court in this case did not result in a biased juror participating in Clark's trial, and Clark has not shown that any error was otherwise deliberate or made in bad faith. 
  3. The Trial Court's Error Did Not Violate Clark's Right to Equal Protection 
  ¶47 Mirroring Judge Schutz's partial dissent, Clark argues that because Juror K expressed racial bias against him, the trial court's denial of Clark's for-cause challenge violated Clark's right to equal protection under the Fourteenth Amendment, and that the court's error amounted to structural error. Because Clark cannot establish a violation of his right to equal protection, we disagree. 
 23
  a. Bias in Jury Selection and the Equal Protection Clause 
  ¶48 The Equal Protection Clause of the Fourteenth Amendment prohibits the state from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The "central purpose" of the Equal Protection Clause is "the prevention of official conduct discriminating on the basis of race." Washington v. Davis, 426 U.S. 229, 239 (1976). Accordingly, proof of an equal protection violation requires a showing of (1) purposeful discrimination, (2) attributable to the state. Id.; Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991). 
  ¶49 Beginning with Swain v. Alabama, 380 U.S. 202 (1965), the Supreme Court has issued several decisions concerning the application of the Equal Protection Clause in the context of jury selection. Perhaps most notably, in Batson, the Court held that the Constitution forbids racial discrimination in jury selection—specifically, the state may not exercise peremptory challenges to purposefully or deliberately exclude persons from participating in a jury on account of their race. Batson, 476 U.S. at 84 (citing Swain, 380 U.S. at 203-04). Batson established a three-step analysis designed to determine whether a peremptory strike reflected purposeful discrimination. People v. Ojeda, 2022 CO 7, ¶ 21, 503 P.3d 856, 862; see also Batson, 476 U.S. at 93 ("As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the 
 24
  existence of purposeful discrimination.'") (quoting Whitus v. Georgia, 385 U.S. 545, 550 (1967)). 
  ¶50 Although Clark leans into the Batson framework to argue against racial bias in the jury trial context, he fails to articulate how the Batson framework applies to the challenge for cause to Juror K. The Batson framework addresses racial bias in the jury selection process by prohibiting the discriminatory use of peremptory challenges to remove jurors on the basis of race. Clark's argument focuses on a completely different kind of "racial bias in the jury selection process"—namely, a potential juror's expression of racial bias during voir dire. But the Batson framework was not designed to address the issue of juror bias, which implicates the defendant's Sixth Amendment right to an impartial jury. Instead, Batson and its progeny rest on the defendant's "right to be tried by a jury whose members are selected by nondiscriminatory criteria." Powers v. Ohio, 499 U.S. 400, 404 (1991). 
  ¶51 In his separate opinion, Judge Schutz noted that the Batson framework "was designed 'to serve multiple ends,' only one of which was to protect individual defendants from discrimination in the selection of jurors." Clark, ¶ 96, 512 P.3d at 1090 (Schutz, J., concurring in part and dissenting in part) (quoting Powers, 499 U.S. at 406). But the Supreme Court's Batson cases all focus on the harms that derive from the discriminatory use of peremptory challenges. See Powers, 499 U.S. at 406. For example, a defendant is denied equal protection of the laws when tried 
 25
  by a jury from which members of the defendant's race have been purposefully excluded. Id. at 404. In addition, the discriminatory use of peremptory challenges harms the excluded jurors and the community at large. Id.; see also McCollum, 505 U.S. at 48-49 (acknowledging that the harm that flows from discriminatory jury selection also undermines public confidence in the integrity of the criminal justice system). But the various harms addressed by Batson all stem from discrimination in the selection of jurors—specifically, discrimination in the discretionary exercise of peremptory challenges. Because Clark's argument does not concern purposeful discrimination in the selection of jurors, his reliance on the Batson framework is misplaced. 
  ¶52 Even aside from the obvious factual distinctions between Batson cases and the circumstances here, Clark fails to allege any equal protection violation. As explained above, the Equal Protection Clause prohibits state actors from purposefully discriminating on the basis of race. Clark argues that, by "tolerating" Juror K's continued presence on the jury despite his racially biased comments, the court denied Clark equal protection of the law. 
  ¶53 To support his contention that the tolerance of racial bias constitutes an equal protection violation, Clark cites McCollum. In McCollum, the Court addressed whether to extend the Batson framework to apply to a criminal defendant's "purposeful racial discrimination in the exercise of peremptory 
 26
  challenges." 505 U.S. at 46-48 (emphasis added). The issue of whether purposeful discrimination occurred was not at issue—in fact, that issue would be determined, if the framework applied, through the Batson analysis itself. Id. at 59. 
  ¶54 Accordingly, the McCollum Court's analysis began with the question of whether the purposefully discriminatory exercise of peremptory challenges by the defense causes the same kind of harm addressed by Batson. The Court concluded that it did, stating: "'[B]e it at the hands of the State or the defense,' if a court allows jurors to be excluded because of group bias, '[it] is [a] willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.'" 505 U.S. at 49-50 (alterations in original) (quoting State v. Alvarado, 534 A.2d 440, 442 (N.J.Super. Ct. Law Div. 1987)). 
  ¶55 Clark relies on this language to support his contention that a court's tolerance of racial bias is, standing alone, sufficient to establish an equal protection violation. But the quote from McCollum provides no such support. Whether conduct was purposefully discriminatory was not at issue in McCollum; thus, the quoted language has no relevance to that element of an equal protection violation claim. The language is likewise irrelevant to the determination of whether there was state action. In fact, the court immediately followed the quoted language by saying: 
 
 The fact that a defendant's use of discriminatory
 peremptory challenges harms the jurors and the community
 does not end our equal
 
 27
 
 protection inquiry. Racial discrimination, although
 repugnant in all contexts, violates the Constitution only
 when it is attributable to state action. Thus, the
 second question that must be answered is whether a criminal
 defendant's exercise of a peremptory challenge
 constitutes state action for purposes of the Equal Protection
 Clause.
 
  505 U.S. at 50 (citation omitted) (emphases added). 
  ¶56 To the extent Clark contends that the trial court's ruling unnecessarily required him to use a peremptory challenge on the basis of his race, we disagree. Clark analogizes the trial court's ruling to a hypothetical statute that provides Black defendants with one less peremptory challenge than white defendants. While such a statute would surely violate the Equal Protection Clause, no comparable purposeful discrimination occurred here. As discussed above, nothing in the record suggests that the trial court purposely denied Clark's challenge for cause to force Clark to expend a peremptory challenge. Were that true, the court's error would not have been made in good faith and would therefore be excepted from Novotny's general rule. 
  ¶57 Finally, Clark contends that the trial court's denial of his challenge for cause to Juror K amounts to structural error because the impacts of the error reflect the concerns articulated by the Supreme Court in Weaver v. Massachusetts, 582 U.S. 286 (2017). There, the Court articulated three broad rationales for deeming an error structural, namely where (1) the right at issue protects some interest other than preventing the defendant's erroneous conviction; (2) "the effects of the error are 
 28
  simply too hard to measure," making it "almost impossible" for the government to prove the error was harmless beyond a reasonable doubt; or (3) the error always results in fundamental unfairness and thus any effort by the government to show harmlessness "would be futile." Id. at 295-96. 
  ¶58 As we have explained, structural errors are a narrow class of constitutional errors. Because Clark has not established a constitutional violation, any error by the trial court cannot be deemed structural. Regardless, the error here did not result in the type of harm contemplated by Weaver. Clark focuses on the impact of the judge's decision on the potential jurors' perception of the judiciary, saying that the denial "sent an intolerable message." As a factual matter, this claim is unsupported. 
  ¶59 Crucially, there is no evidence that the jury was aware of the challenge, let alone the court's ruling or its reasoning. The challenge and the ruling were made during a bench conference, out of the potential jurors' hearing. And when the trial court provided its reasoning on the record after the fact, all of the jurors had been dismissed from the room. Ultimately, the only events the jurors witnessed were Juror K's comments during voir dire and Juror K's subsequent dismissal. If there was any reasonable conclusion to draw about the permissibility of racial bias in the courtroom, it was that such expressions of bias result in dismissal, not that they are tolerated or welcomed. 
 29
  ¶60 Clark has thus failed to prove any cognizable harm, much less a constitutional error that rises to the level of structural error. 
  4. The Trial Court's Erroneous Denial of Clark's For-Cause Challenge of Juror K Was Harmless and Does Not Require Reversal 
  ¶61 Because Novotny and Vigil govern the analysis here, we review the trial court's error for harmlessness to determine whether reversal is required. "Under this standard, reversal is required only if the error affects the substantial rights of the parties. That is, we reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" Hagos v. People, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (citations omitted) (quoting Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986)). 
  ¶62 Juror K did not actually serve on the jury in Clark's trial. Therefore, the trial court's denial of Clark's challenge to remove Juror K for cause did not substantially influence the verdict or affect the fairness of the trial proceedings. As explained above, the court's denial of his for-cause challenge did not "force" Clark to use one of his peremptory challenges or otherwise deprive him of the full allotment of peremptory challenges granted by statute to criminal defendants. 
  ¶63 To hold that an erroneous denial of a challenge for cause to a potential juror who has expressed racial bias is not structural error is not to say it is unimportant or inconsequential. However, where, as here, the defendant's use of a peremptory 
 30
  challenge to remove the juror ensured that the biased juror did not ultimately sit on the jury, reversal of the defendant's conviction is not required because there was no violation of the right to an impartial jury or the right to equal protection. Where a good faith error does not end up impacting the defendant's trial, reversal is unwarranted. 
  B. Juror LL's Affidavit 
  ¶64 Clark argues that Juror LL's affidavit describing statements made by another juror during deliberations constituted "extraneous prejudicial information" under CRE 606(b), and that he is therefore entitled to an evidentiary hearing to determine whether that information posed a reasonable possibility of prejudice. After setting forth the applicable standard of review, we discuss CRE 606(b) and the requirements for a new trial based on a claim that the jury was exposed to extraneous prejudicial information. Applying this framework, we conclude that the statements mentioned in Juror LL's affidavit did not constitute "extraneous prejudicial information." 
  1. Standard of Review 
  ¶65 Whether the statements in Juror LL's affidavit constituted "extraneous prejudicial information" under CRE 606(b) is a legal question we review de novo. See People v. Harlan, 109 P.3d 616, 624 (Colo. 2005). 
 31
  2. CRE 606(b) 
  ¶66 In order to promote "finality of verdicts, shield verdicts from impeachment, and protect jurors from harassment and coercion," id., Colorado law strongly disfavors any juror testimony impeaching a verdict, Kendrick v. Pippin, 252 P.3d 1052, 1063 (Colo. 2011) (citing Harlan, 109 P.3d at 624), abrogated on other grounds by Bedor v. Johnson, 2013 CO 4, 292 P.3d 924. With certain exceptions not relevant here, see Pena-Rodriguez, 580 U.S. at 225, such testimony is generally prohibited, "even on grounds such as mistake, misunderstanding of the law or facts, failure to follow instructions, lack of unanimity, or application of the wrong legal standard," Harlan, 109 P.3d at 624 (citing Hall v. Levine, 104 P.3d 222, 225 (Colo. 2005)). 
  ¶67 CRE 606(b) codifies this general prohibition on inquiries into the validity of a verdict, stating that: 
 
 a juror may not testify as to any matter or statement
 occurring during the course of the jury's deliberations
 or to the effect of anything upon his or any other
 juror's mind or emotions as influencing him to assent to
 or dissent from the verdict or indictment or concerning his
 mental processes in connection therewith.
 
  Rule 606(b) nevertheless allows inquiry into three narrow matters: "(1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the 
 32
  verdict form." Id. Under the Rule, a trial court may not receive a juror's affidavit concerning anything other than these three matters. Id. ("A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying."). 
  ¶68 To set aside a verdict because of extraneous prejudicial information improperly brought to the jurors' attention, "a party must show both that extraneous information was improperly before the jury and that the extraneous information posed the reasonable possibility of prejudice to the defendant." Kendrick, 252 P.3d at 1063. 
  ¶69 The evaluation of whether the extraneous prejudicial information exception to CRE 606(b) applies proceeds in two steps. Harlan, 109 P.3d at 629. 
  ¶70 At step one, the court must determine whether the party alleging misconduct has presented competent evidence alleging that extraneous prejudicial information was improperly before the jury. Kendrick, 252 P.3d at 1063-64. At this step, the trial court must determine as a matter of law whether the alleged information before the jury constitutes prejudicial extraneous information. See Newman, ¶ 14, 471 P.3d at 1250. If the information does not constitute prejudicial extraneous information, the court may properly dismiss the motion for a new trial without a hearing. 
 33
  ¶71 If the information does constitute extraneous prejudicial information, the court must determine at step two (often following a hearing) whether there is a reasonable possibility that the extraneous prejudicial information influenced the verdict to the detriment of the defendant. Kendrick, 252 P.3d at 1063. The test at the second step applies an objective standard—the relevant question is whether there is a reasonable possibility of such impact. Harlan, 109 P.3d at 625. 
  ¶72 During the second step, the court should consider those factors articulated in our prior cases: (1) how the extraneous information related to critical issues in the case; (2) the degree of authority represented by the extraneous information; (3) how the information was acquired; (4) whether the information was shared with other jurors in the jury room; (5) whether the information was considered before the jury reached its verdict; and (6) whether there is a reasonable possibility that the information would influence a typical juror to the defendant's detriment. Id. at 630-31. 
  ¶73 Clark argues that consideration of whether the extraneous information relates to an issue before the jury pertains only to the prejudice analysis at step two and has no bearing on whether the information is "extraneous" at step one. We disagree. 
  ¶74 At step one, the court must determine whether the information qualifies as "extraneous prejudicial information." This step requires the court to determine if 
 34
  the information was "prejudicial" (and not merely extraneous). By contrast, at step two, the inquiry is whether there is a reasonable possibility that the extraneous prejudicial information affected the jury's verdict to the detriment of the defendant. While the determination of whether the information is prejudicial at step one overlaps with the determination of whether there is a reasonable possibility that the information prejudiced the defendant at step two, the burden on the defendant at each step is different. At step one, "the party seeking impeachment must produce competent evidence to attack the verdict," that is, evidence admissible under CRE 606(b) that calls into question the validity of the verdict. People v. Garcia, 752 P.2d 570, 583 (Colo. 1988). However, at step two, "the party must establish adequate grounds to overturn the verdict." Id. 
  3. What Constitutes Extraneous Prejudicial Information? 
  ¶75" [E]xtraneous prejudicial information consists of (1) 'legal content and specific factual information' (2) 'learned from outside the record' (3) that is 'relevant to the issues in a case.'" Newman, ¶ 15, 471 P.3d at 1250 (quoting Kendrick, 252 P.3d at 1064). Like the division below, we find the thorough analysis of our case law provided in the court of appeals' opinion in Newman helpful. 
 35
  a. Legal Content 
  ¶76 Extraneous prejudicial information can take the form of legal content or factual information. Clark argues that the statements at issue here introduced extraneous legal content. 
  ¶77 In evaluating what constitutes "legal content," Newman evaluated four of our decisions for guidance. First, in Alvarez v. People, 653 P.2d 1127, 1131 (Colo. 1982), this court held that it is improper for a juror to consult a dictionary definition of "reasonable" in order to "assist in understanding legal terminology in the court's instructions" on the reasonable doubt standard. 
  ¶78 Similarly, in both Niemand v. District Court, 684 P.2d 931, 932 n.1 (Colo. 1984), and Wiser v. People, 732 P.2d 1139, 1141 (Colo. 1987), this court determined that a juror's consultation of a dictionary to assist in understanding of elements of a crime was improper. In Niemand, the juror consulted Black's Law Dictionary to review the definitions of terms relevant to the second degree murder and manslaughter charges the defendant faced, including "malice," "premeditation," and "second degree murder." 684 P.2d at 932. Similarly, in Wiser, the juror looked up the definition of "burglary," one of the crimes with which the defendant was charged. 732 P.2d at 1140. In both cases, we noted that "[j]urors are required to follow only the law as it is given in the court's instructions; they are bound, therefore, to accept the court's definitions of legal concepts and to obtain 
 36
  clarifications of any ambiguities in terminology from the trial judge, not from extraneous sources." Niemand, 684 P.2d at 934; Wiser, 732 P.2d at 1141 (quoting Niemand, 684 P.2d at 934). 
  ¶79 Finally, in Harlan, this court found that the Bible scripture improperly considered by the jury during the death penalty phase of the case could be viewed as an improper "legal instruction, issuing from God, requiring a particular and mandatory punishment for murder." 109 P.3d at 632. 
  ¶80 As Newman articulated, our prior decisions make clear that "legal content" means a statement of law. ¶ 23, 471 P.3d at 1252. 
  b. Outside the Record 
  ¶81 "Extraneous" information is information gleaned from outside the record or information not included in the court's instructions to the jury. Determining whether information was introduced from outside the record is straightforward when the juror conducts an independent investigation into either the facts or the law. See id. at ¶ 32, 471 P.3d at 1253 (first citing People v. Wadle, 97 P.3d 932, 937 (Colo. 2004); and then citing Wiser, 732 P.2d at 1140). The question becomes much more difficult, however, when a juror instead relies on their prior knowledge and experience. See Kendrick, 252 P.3d at 1066 ("The line between a juror's application of her background . . . to the record evidence and a juror's introduction of legal content or specific factual information learned from outside the record can be a fine one."). 
 37
  Still, jurors may properly "rely on their professional and educational expertise to inform their deliberations so long as they do not bring in legal content or specific factual information learned from outside the record." Id. at 1065. 
  ¶82 In Kendrick, we held that "the juror's use of her background in engineering and mathematics to calculate [the defendant]'s speed, distance, and reaction time and the sharing of those calculations with the other jurors did not constitute 'extraneous' information within the meaning of CRE 606(b)." Id. at 1066. We reasoned that, by performing and sharing those calculations, the juror "did not introduce any specific facts or law relevant to the case learned from outside of the judicial proceeding but, rather, merely applied her professional experience and preexisting knowledge of mathematics to the evidence admitted at trial." Id. 
  ¶83 In sum, to be permissible, the experience used by the juror in deliberations must be part of the juror's background, "gained before the juror was selected to participate in the case and not as the result of independent investigation into a matter relevant to the case" and, though the information may be relevant to the matter at hand, it must not include "extra facts or law, not introduced at trial, that are specific to parties or an issue in the case." Id. 
  ¶84 Because the line between past experience and extraneous information is a fine one, the admonition that we "err in favor of the lesser of two evils—protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible 
 38
  juror activity"—is important. Garcia v. People, 997 P.2d 1, 7 (Colo. 2000) (quoting United States v. Thomas, 116 F.3d 606, 623 (2d Cir. 1997)). Permitting reliance on personal experience "furthers the purposes of CRE 606(b) by promoting the finality of verdicts and protecting jurors from harassment." Kendrick, 252 P.3d at 1065. 
  4. The Unnamed Juror's Statement Did Not Constitute Extraneous Prejudicial Information 
  ¶85 Here, the unnamed juror's statement during deliberations that, during a prior jury service, the judge told the jury that it must deliberate until they come to a unanimous decision did not constitute extraneous prejudicial information. 
  ¶86 First, the juror's statement was not "legal content." The retelling of a prior jury experience, even the specific recollection of a judge's alleged statement about jury deliberations, is not a "statement of law." Second, the fact that the juror's statement is based on prior experience and was not the result of independent investigation further compels us to find that the statement was not extraneous. After all, "[a]s a practical matter, it is impossible to select a jury free of preconceived notions about the legal system or to prevent discussion of such information in the jury room." People v. Holt, 266 P.3d 442, 446 (Colo.App. 2011). 
  ¶87 Third, even if we concluded that the juror's statement was extraneous legal content, unlike in Niemand and Wiser, it was not relevant to the jury's decision. The statement did not concern any definition or element of the crimes with which 
 39
  Clark had been charged. But even beyond that, the statement did not relate to any other matter the jury was charged with deciding. How long the jury was required to deliberate did not have anything to do with whether the prosecution had met its burden of proof. 
  ¶88 Therefore, the trial court correctly determined that the statement described in Juror LL's affidavit did not constitute "extraneous prejudicial information" under CRE 606(b). 
  III. Conclusion 
  ¶89 We conclude that the erroneous denial of a for-cause challenge to a juror who evinces racial bias against the defendant is not structural error where the error was made in good faith and the biased juror did not actually participate in the jury. In addition, we conclude that a juror's statement during deliberations recalling a judge's alleged comment during her prior jury service was not extraneous prejudicial information under CRE 606(b). Accordingly, we affirm the judgment of the court of appeals. 
 40
  JUSTICE HOOD, joined by JUSTICE GABRIEL, dissenting. 
  ¶90 This is a difficult and troubling case (at many levels) in which the division below and the majority here claim, in so many words, that obedience to doctrine forces us to swallow a bitter procedural pill. Despite declaring that racial bias is detestable in any context, Maj. op. ¶ 1, the majority, no doubt reluctantly, leaves unremedied the district court's failure to denounce racial bias during jury selection. Instead, it essentially says that we have little choice but to throw up our hands and concede, "no harm, no foul." 
  ¶91 But the district court's error in excusing overt, in-court racism[1] as nothing more than legitimate political opinion, produced at least two harms, both of which are difficult to quantify but unmistakably real. First, a criminal defendant like Reginald Keith Clark—to whom our state and federal constitutions pledge rights to equal protection and a fair trial—suffered the risk that some remaining venire members were emboldened to act on similar but unvoiced biases. Second, and no less important, the whole unseemly exercise leaves our system of criminal justice diminished in the eyes of the public. 
 41
  ¶92 Even so, the majority concludes that (1) People v. Novotny, 2014 CO 18, 320 P.3d 1194, contemplates only two kinds of structural error arising from an erroneous denial of a for-cause challenge (i.e., the explicitly biased juror sat or the court acted in bad faith), Maj. op. ¶¶ 40-41; and (2) equal protection principles are relevant to our structural error analysis in this context only when the record reflects intentional discrimination by the court, id. at ¶¶ 48-55. But because I believe fidelity to precedent doesn't leave us powerless to address the harm inflicted here, I respectfully dissent. 
  I. Structural Error 
  ¶93 Our basic legal yardstick is straightforward. Structural errors "defy analysis by 'harmless-error' standards." Arizona v. Fulminante, 499 U.S. 279, 309 (1991). There are "at least three broad rationales" for "[t]he precise reason why a particular error is not amenable to [harmless-error] analysis—and thus the precise reason why the Court has deemed it structural," Weaver v. Massachusetts, 582 U.S. 286, 295 (2017): 
 
 [1] errors concerning rights protecting some interest other
 than the defendant's interest in not being erroneously
 convicted; [2] errors the effects of which are too hard to
 measure, in the sense of being necessarily unquantifiable and
 indeterminate; and [3] errors that can be said to always
 result in fundamental unfairness,
 
  Howard-Walker v. People, 2019 CO 69, ¶ 25, 443 P.3d 1007, 1011 (quoting James v. People, 2018 CO 72, ¶ 15, 426 P.3d 336, 339). 
 42
  ¶94 Denying a party's for-cause challenge of a potential juror who expressed racial bias implicates the first two of these rationales. See Weaver, 582 U.S. at 296 ("[M]ore than one of these rationales may be part of the explanation for why an error is deemed to be structural."). As noted, this error harms the defendant albeit in ways hard to measure. And the error implicates a public interest that extends beyond a defendant's interest in not being erroneously convicted. 
  II. The Harm to Clark 
  ¶95 Let's start with the harm to Clark. Over thirty years ago, the Supreme Court warned that the presence of racial discrimination during voir dire is "often apparent to the entire jury panel, [and] casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law." Powers v. Ohio, 499 U.S. 400, 412 (1991) (emphases added). By failing to release Juror K after he expressed racial bias, the court tacitly allowed the remaining venire members to cling to similar prejudices while deciding Clark's fate. 
  ¶96 As Judge Schutz explained in his separate opinion below: The district court's decision broadcasted to all who remained "that a prospective juror could sit in judgment of a person against whom he had an acknowledged racial bias." People v. Clark, 2022 COA 33, ¶ 98, 512 P.3d 1074, 1091 (Schutz, J., concurring in part and dissenting in part). The district court placed an aura of legitimacy around Juror K's racial bias by failing to condemn it, and in turn, introduced the risk that 
 43
  sitting jurors may have felt comfortable—or worse, empowered—to make judgments rooted in bias against the only "[B]lack gentleman" in the room—Clark. 
  ¶97 The majority dismisses this reality by claiming that "there is no evidence that the jury was aware of the challenge, let alone the court's ruling or its reasoning." Maj. op. ¶ 59. This argument suffers from a false premise: namely, that jurors lack the capacity to understand what is unfolding around them during our court proceedings. In my experience, however, jurors aren't as naive as my colleagues in the majority suggest. 
  ¶98 On the contrary, there are at least three reasons why the prospective jurors here undoubtedly understood the district court to affirm Juror K's ability to serve despite his racial bias. First, the court had already explained to prospective jurors the mechanics of the for-cause-dismissal stage of voir dire, so everyone knew that the court was determining whether prospective jurors were eligible to serve. Second, the prospective jurors had witnessed the court remove a juror whose impartiality it had found wanting. And third, the district court asked Juror K follow-up questions—something it had only done when a prospective juror's answers gave it some pause—before confirming that Juror K could serve. It's of no moment that the court's justification was given out of earshot of the prospective jurors. The ruling itself was clear: Even after expressing racial bias, Juror K was fit to serve. 
 44
  ¶99 The majority is equally wrong that "the only events the jurors witnessed were Juror K's comments during voir dire and Juror K's subsequent dismissal," which would've left them with the impression that "bias result[s] in dismissal." Id. Again, jurors are sharper than that. The court explained that the peremptory-challenge phase of voir dire was distinct from the for-cause stage. The court also emphasized that peremptory challenges don't require a reason and were attributable to the attorneys—not the court—so prospective jurors shouldn't "take any offense" at removal. The majority glosses over these facts, perhaps because they establish that no reasonable juror would have equated the defense's use of a peremptory strike with state condemnation of Juror K's racial bias. 
  ¶100 The district court's error thus goes to the very foundation of our criminal justice system—the impartiality of the criminal jury, the body responsible for determining a defendant's innocence or guilt. "When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm." Vasquez v. Hillery, 474 U.S. 254, 263 (1986). Because these errors threaten the "right to an impartial adjudicator, be it judge or jury," they "'can never be treated as harmless.'" Gray v. Mississippi, 481 U.S. 648, 668 (1987) (quoting Chapman v. California, 386 U.S. 18, 23 (1967)); accord People v. Abu-Nantambu-El, 2019 CO 106, ¶ 27, 454 P.3d 1044, 1050. 
 45
  ¶101 Here, any bias Juror K introduced into the proceeding during voir dire lingered in the background of the entire trial. See Powers, 499 U.S. at 412 ("The influence of the voir dire process may persist through the whole course of the trial proceedings."). To what effect, we don't know exactly. But that doesn't mean we should ignore the possibility that the error tainted the remaining venire. This difficulty is precisely why the error is structural: "the effects of the error are simply too hard to measure." Weaver, 582 U.S. at 295. Indeed, it is "because a review of the record could not reveal the impact of the defect" that the error is structural. United States v. Iribe-Perez, 129 F.3d 1167, 1172 (10th Cir. 1997); see also Vasquez, 474 U.S. at 263-64 (concluding that discrimination in the grand jury selection was "not amenable to harmless-error review" because of "the difficulty of assessing [the] effect on any given defendant"). 
  ¶102 The district court's error in refusing to excuse Juror K when Clark challenged him for cause jeopardized Clark's right to a fair trial by giving judicial approval to Juror K's racial bias in front of the remaining venire members: "[A] defendant has the right to an impartial jury that can view him without racial animus, which so long has distorted our system of criminal justice." Georgia v. McCollum, 505 U.S. 42, 58 (1992). Because that constitutional right is of paramount importance and because the effect of the district court's error evades an outcome determinative analysis, the district court's error was structural. 
 46
  III. The Harm to the Integrity of the Justice System 
  ¶103 The error was also structural because it impugned the integrity of the justice system. Racial bias is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." Pena-Rodriguez v. Colorado, 580 U.S. 206, 224 (2017). 
  ¶104 I agree with Judge Schutz that what occurred during voir dire offends Clark's equal protection right to be free from state-approved racial discrimination. See Clark, ¶¶ 93-96, 102, 512 P.3d at 1090-91, 1092 (Schutz, J., concurring in part and dissenting in part). "By its inaction," the district court "made itself a party to" and "place[d] its power, property[,] and prestige behind" Juror K's racial bias. Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). Time and again the Supreme Court has acknowledged that similar inaction "undermine[s] public confidence in the fairness of our system of justice." Rivera v. Illinois, 556 U.S. 148, 161 (2009) (alteration in original) (quoting Batson v. Kentucky, 476 U.S. 79, 87 (1986)); accord Pena-Rodriguez, 580 U.S. at 225; McCollum, 505 U.S. at 49-50; People v. Ojeda, 2022 CO 7, ¶ 20, 503 P.3d 856, 861-62. For that reason, "[n]o surer way could be devised to bring the processes of justice into disrepute" than "to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors." Aldridge v. United States, 283 U.S. 308, 315 (1931) (emphasis added). Yet that is the message the district court's error sends. 
 47
  ¶105 This is an affront to basic equal protection principles and does great harm to the public's perception of the justice system. See Mistretta v. United States, 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."); McCollum, 505 U.S. at 49-50 ("[T]he very foundation of our system of justice [is] our citizens' confidence in it."). 
  ¶106 The majority concludes that the district court's error wasn't structural because the error wasn't constitutional. Maj. op. ¶ 58. To the contrary, the underlying error in this case violated Clark's Sixth Amendment right to an impartial jury. "[I]f a trial court error results in the seating of a juror who is actually biased against the defendant, the defendant's right to an impartial jury is violated, the error is structural, and reversal is required." Abu-Nantambu-El, ¶ 30, 454 P.3d at 1050. There is no Sixth Amendment violation "so long as the jury that sits is impartial." United States v. Martinez-Salazar, 528 U.S. 304, 305 (2000) (quoting Ross v. Oklahoma, 487 U.S. 81, 88 (1988)). But I cannot say as much on these facts. Here, the district court's error invited similarly biased jurors to sit on Clark's jury. Thus, even without a formal equal protection violation, the court is still confronted with a constitutional error. And from there, the nub of the issue is simply whether the effects of that error "defy analysis by 'harmless-error' standards." Fulminante, 499 U.S. at 309. 
 48
  ¶107 As discussed above, the error here fits that bill. The district court's error produced harms that (1) cannot be measured and thus defy an outcomedeterminative analysis and (2) concern interests other than the defendant's right to a sound verdict; namely, protection of the public's faith in the judiciary. Accordingly, the district court's error is structural and, in my opinion, entitles Clark to a new trial. See People v. Madrid, 2023 CO 12, ¶ 60, 526 P.3d 185, 198. Thus, I respectfully dissent. 
  --------- 
  Notes: 
  [1] As of the 2020 Census, 5,077—or about 87.41%—of Gilpin County's 5,808 residents were "[w]hite alone." U.S. Census Bureau, Race and Ethnicity: Gilpin County, Colorado, https://data.census.gov/profile/Gilpin_County,_Colorado?g=050XX00US08047#race-and-ethnicity [https:// perma.cc/XA8B-MRQU]. 
  [2] We granted certiorari to review the following issues: 
 
 1. [REFRAMED] Whether the trial court's erroneous
 denial of a defendant's for-cause challenge to a juror
 who expressed racial bias was harmless or structural
 error.
 
 
 2. Whether a juror's comments during
 deliberations, that she learned from a judge in prior jury
 service that jurors must deliberate indefinitely until a
 unanimous verdict is reached, constitute "extraneous
 prejudicial information" under CRE 606(b).
 
  [3] Because the courtroom where voir dire was held was not equipped to record bench conferences, the record of the conversation the parties had with the judge during the bench conference was made by the judge after the fact. After the parties had finished exercising their peremptory challenges, the bailiff took the jurors to the jury room and the judge summarized for the record the parties' for-cause challenges and the judge's rulings on them. 
  [4] Because he would have reversed Clark's conviction based on his resolution of the challenge-for-cause issue, Judge Schutz declined to address the remaining issues. Id. at ¶ 106, 512 P.3d at 1092 (Schutz, J., concurring in part and dissenting in part). 
  [1] We agree with the division majority that there was a "glaring implication" that Juror K harbored an "acknowledged bias against nonwhite people like defendant." People v. Clark, 2022 COA 33, ¶ 16, 512 P.3d 1074, 1078. This inference now seems undisputed. 
  --------- 
 
    
